UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ED FIALA, individually and on behalf of other similarly situated persons who reside within the Wasco Sanitary District, and TIM KOBLER CUSTOM HOMES, INC., ) ) ) | |
| ) | 10 C 2895 |
| Plaintiffs, ) | |
| ) | Judge Feinerman |
| vs. ) | |
| ) | |
| WASCO SANITARY DISTRICT, ROBERT SKIDMORE, RAUL BRIZUELA, GARY SINDELAR, CHARLES V. MUSCARELLO, PATRICK GRIFFIN, JERRY BOOSE, KENNETH BLOOD, FOX MILL LIMITED PARTNERSHIP, B&B ENTERPRISES, and HUDSON HARRISON, ) ) ) ) ) ) ) | |
| ) | |
| Defendants. ) | |

## Memorandum Opinion and Order

Plaintiffs Ed Fiala and Tim Kobler Custom Homes, Inc. brought this action in the Circuit

Court of the Sixteenth Judicial Circuit, Kane County, Illinois, against Defendants Wasco

Sanitary District, Robert Skidmore, Raul Brizuela, Gary Sindelar, Charles Muscarello, Patrick

Griffin, Jerry Boose, Kenneth Blood, Fox Mill Limited Partnership ("FMLP"), B&B Enterprises,

and Hudson Harrison, alleging violations of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and Illinois law.  After the case was removed to federal

court, Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  Docs. 18, 21, 24, 28, 32.  Because Plaintiffs' alleged injuries do not satisfy the

requirements of RICO standing, the RICO claims are dismissed.  And having disposed of the

only federal claims in the case, the court remands the state law claims to state court.

**Background**

A complaint's well-pleaded facts generally are assumed true on Rule 12(b)(1) and 12(b)(6) motions, and all reasonable inferences are drawn in the plaintiff's favor. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010); *Patel v. City of Chi.*, 383 F.3d 569, 572 (7th Cir. 2004). Also pertinent at the Rule 12(b) stage are exhibits attached to the complaint, *see* Fed. R. Civ. P. 10(c); *Witzke v. Femal*, 376 F.3d 744, 749 (7th Cir. 2004), and exhibits attached to the parties' briefs that are "referred to" in the complaint and "central to [the plaintiff's] claim," *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994). *See Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) (collecting cases). In addition, orders entered and filings made in this and other courts are subject to judicial notice, as are "adjudicative facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *United States v. Stevens*, 500 F.3d 625, 628 n.4 (7th Cir. 2007) (internal quotation marks omitted); *see Cancer Found., Inc. v. Cerberus Capital Mgmt. LP*, 559 F.3d 671, 676 n.2 (7th Cir. 2009). To the extent an exhibit or a judicially noticed court document or fact contradicts the complaint's allegations, the exhibit or court document takes precedence. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). The following facts are stated as favorably to Plaintiffs as permitted by the complaint and other materials that may be considered on a Rule 12(b) motion.

Fiala owns a home in the Fox Mill subdivision, which is located within the borders of the Wasco Sanitary District, a municipal entity that provides its constituents with water and sanitary sewer services. Doc. 88 at ¶¶ 1, 3. Kobler is a developer that built homes in Fox Mill. *Id*. at ¶ 2. According to the second amended complaint, which is the operative pleading, Defendants for many years have engaged in an illegal scheme to misdirect funds from the District to B&B and

-2-

FMLP, which own homes in Fox Mill and which allegedly are corporate alter egos. *Id*. at ¶¶ 18, 19(f), 46(a) & (ww). The scheme allegedly commenced in 1994, when the District and FMLP entered into an annexation agreement ("Fox Mill Agreement") under which the District would annex the Fox Mill subdivision, *id*. at ¶ 20, which in turn would receive water and sewer services from the District, Doc. 1-3 at 10-11. The Fox Mill Agreement further provided that the District would enter into agreements for reimbursement to FMLP for a portion of the cost of wastewater and water facilities constructed or paid for by FMLP. Doc. 1-4 at 2-3. Although the District and FMLP never executed any such agreement, Doc. 88 at ¶ 28, the District has since 1994 reimbursed FMLP and B&B by allowing them to collect connection fees from existing and prospective District customers, *id*. at ¶ 25.

The complaint alleges that these reimbursements were prohibited by the Sanitary Act of 1936, 70 ILCS 2805/1 *et seq*., as it stood at the time the Fox Mill Agreement was executed. Doc. 88 at ¶ 27. The Sanitary Act later was amended to permit such reimbursements, but Plaintiffs contend that the amended statute still requires that the connection fees first be paid to the District and only then turned over to FMLP. Doc. 42 at 23. Plaintiffs assert that the District, notwithstanding the amendment, directed developers to pay connection fees directly to FMLP and B&B prior to their receiving sanitation services. Doc. 88 at ¶ 26; Doc. 42 at 2. Kobler paid connection fees to FMLP and B&B, as have numerous others. As a result, funds that should have been used by the District for infrastructure and capacity instead were paid to FMLP or B&B. This diversion of funds has required the District to charge higher fees, assessments, and property taxes, which Fiala would not have paid absent the illegal arrangement.

Defendants allegedly perpetrated this scheme through a host of illegal and fraudulent activities. The District's three trustees during the relevant time period—Skidmore, Brizuela, and

Sindelar—had undisclosed financial or familial relations to B&B and its principals, Boose and Blood. Doc. 88 at ¶ 46(s), (t), (y), (z), (aa), (dd), (ee). The trustees filed statements of financial interest that failed to reveal those interests. *Id*. at ¶ 46(u), (y), (z), (aa), (dd), (ee). The trustees, FMLP, B&B, Boose, and Blood, with the assistance of Griffin (B&B's attorney) and Muscarello (the District's attorney), filed or caused to be filed false applications and certifications with state regulators concerning the District's wastewater capacity. *Id*. at ¶ 46(e), (n), (r), (v), (bb), (gg), (hh), (oo).

Harrison is another home developer in the District. In 2005, Harrison sought to annex into the District an area called Norton Farms that he wanted to develop. *Id*. at ¶ 29. The District denied Harrison's request. *Id.* at ¶ 30. Harrison renewed the application in 2008, this time retaining Griffin as his attorney. *Id*. at ¶ 31. Harrison then agreed to pay $2.65 million in exchange for the annexation and the receipt of sufficient wastewater capacity for the homes in Norton Farms ("Norton Farms Agreement"). *Id*. at ¶ 33. The 2008 application was approved. *Id*. at ¶ 32. Plaintiffs maintain that Harrison bribed Brizuela (one of the trustees) by giving him a recorded interest in real property. *Id*. at ¶¶ 46(ss) & (tt); Doc. 42 at 11. Plaintiffs also allege that Harrison's retention of Griffin as his attorney was another bribe intended to gain the District's approval. Doc. 88 at ¶ 46(rr).

The Norton Farms Agreement had negative consequences for Fiala. According to the second amended complaint, Fiala received 3.5 "population equivalents" ("PEs") with the purchase of his home. *Id*. at ¶ 1; Doc. 42 at 27; Doc. 105 at 6. A PE represents the amount of wastewater one individual is expected to generate in one day, which state law estimates to be 100 gallons. *See* 225 ILCS 225/3(6). Applicable regulations assume that a single-family home uses 3.5 PEs. *See* 35 Ill. Admin. Code § 370 App. A. The second amended complaint alleges

-4-

that Fiala, by virtue of purchasing a single-family home that was connected to the District's facilities, "owns" 3.5 PEs. Doc. 88 at ¶ 1. As a result of the Norton Farms Agreement, one PE was "stolen" from Fiala and every other homeowner in the Fox Mill subdivision and then "sold" to Harrison to give the Norton Farms development sufficient wastewater capacity. *Id*. at ¶ 46(j), (o), (x), (ii), (pp), (vv). Each PE allegedly is worth $10,000. *Ibid*. The District's "sale" of Fiala's and other homeowners' PEs to Harrison increased the District's wastewater usage beyond its capacity, resulting in the spraying of wastewater effluent into public waterways. *Id*. at ¶ 46(ww).

The second amended complaint purports to state claims under RICO and Illinois law. *Id*. at ¶ 15. For the RICO claim, which is set forth in Count I of the second amended complaint, Plaintiffs seek actual damages, treble damages, attorney fees, and costs. *Id*. at p. 46. For the state law claims, which are set forth in Counts II-V, Plaintiffs seek compensatory and punitive damages, and ask the court to nullify the Norton Farms Agreement; to declare that the Fox Mill Agreement does not permit FMLP or B&B to seek the reimbursements; to require that all monies received by B&B, FMLP, or "the B&B Family" be returned to the individuals and entities from whom the monies were wrongfully obtained; to declare that the amendment to the Sanitary District Act of 1936 does not apply retroactively to any project constructed prior to its enactment; and to declare that any excess PEs are the District's property. *Id*. at ¶ 67(a), (b), (c), (e) (f), and p. 50. Plaintiffs ask the court under the Illinois Public Officer Prohibited Activities Act, 50 ILCS 105/3, to declare that the trustee defendants violated that statute and to nullify any District contract executed while one of the trustees held office, and, pursuant to 50 ILCS 105/4, to remove the trustees from public office and to appoint a receiver until a proper election for successor trustees can be held. *Id*. at ¶¶ 70(a) & (b), 73, 74.

-5-

## Discussion

Five sets of defendants have filed five separate motions to dismiss.  One argument made or adopted by all Defendants is that Plaintiffs lack RICO standing.  That argument, which is correct and which disposes of the RICO claims, is addressed first, followed by consideration of the state law claims.

## I.      RICO Claims

RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue … in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).  "The phrase 'injured in [his] business or property' has been interpreted as a standing requirement—rather than an element of the cause of action—which must be satisfied in order to prevail on a RICO claim."  *Evans v. City of Chi.*, 434 F.3d 916, 924 (7th Cir. 2006) (citing *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 958-59 (7th Cir. 1996)).  Therefore, "to establish standing to sue for a violation of § 1962, a plaintiff must allege that the defendant's overt act in furtherance of the RICO conspiracy injured the plaintiff's business or property."  *Gagan*, 77 F.3d at 959.

The portions of Plaintiffs' second amended complaint and briefs that conceivably bear upon RICO standing generously can be read to maintain that Plaintiffs suffered the following injuries: (1) Defendants misappropriated one of Fiala's PEs and reassigned it to Harrison's homes in Norton Farms; (2) Defendants' actions "endangered the health and welfare of Fiala and others similarly situated"; (3) because Kobler and other developers paid B&B or FMLP the connection fees that should have been paid to the District, insufficient investments were made in infrastructure and capacity, leading the District to charge Fiala and other homeowners higher

fees, assessments, and property taxes to make up the shortfall; (4) as a result of Defendants' actions, Kobler was forced to pay "illegal fees" to B&B that it would not have paid "but for Defendants' wrongful acts." Doc. 42 at 26-27; Doc. 88 at ¶¶ 18, 19(m) 38, 46(ww) & (zz), 51, 59, 62; Doc. 105 at 4-6. Plaintiff forfeited any argument regarding the third and fourth alleged injuries by failing to argue in their briefs that those injuries establish RICO standing. And putting aside forfeiture, none of the alleged injuries satisfy the RICO standing requirement.

### A.    Misappropriation and Reassignment of PEs

The first alleged injury—the taking and reassignment of Fiala's PE—rests on the premise that PEs are property that Fiala owned and that one PE supposedly was taken from Fiala and reassigned to Norton Farms. After all, if the PEs are not property, then Fiala could not own "his" PEs and a PE could not have been wrongfully taken from him. And if the PE was not wrongfully taken from Fiala, then he cannot be said to have suffered an "injury in business or property" under 18 U.S.C. § 1694(c). *See Rylewicz v. Beaton Servs., Ltd.*, 698 F. Supp. 1391, 1396 (N.D. Ill. 1988) ("The term 'property' [in § 1964(c)] contemplates something owned or possessed that an individual has a legitimate claim of entitlement to.").

The second amended complaint alleges that Fiala "owns 3.5 PEs" by virtue of purchasing a home in the Fox Mills subdivision. Doc. 88 at ¶ 1. That allegation is "a legal conclusion couched as a factual allegation," and thus need not be accepted as true on a Rule 12(b) motion. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 465 (7th Cir. 2010). In their briefs opposing dismissal, which is where Plaintiffs need to support their legal conclusions, Plaintiffs cite no legal authority for the proposition that a PE is property belonging to a homeowner. Docs. 42, 105. And the legal authority that is available establishes that Fiala did not own any PEs.

The nature of a PE is established by Illinois law. Different types of residences are designated different numbers of PEs. *See* 35 Ill. Admin. Code § 370 App. A (designating one PE for an efficiency or studio apartment, 1.5 PEs for a one-bedroom apartment, three PEs for a two- or three-bedroom apartment, 3.5 PEs for a single-family dwelling, and 2.25 PEs for a mobile home). A PE is "an average waste loading equivalent to that produced by one person which is defined as 100 gallons per day." 225 ILCS 225/3(6). This unit of measurement is used to estimate the wastewater usage and environmental impact of various structures. As the regulations explain:

> "Population Equivalent" is a term used to evaluate the impact of industrial or other waste on a treatment works or stream. One population equivalent is 100 gallons (380 liters) of sewage per day, containing 0.17 pounds (77 grams) of BOD (5) (five day biochemical oxygen demand) and 0.20 pounds (91 grams) of suspended solids. The impact on a treatment works is evaluated as the equivalent of the highest of the three parameters. Impact on a stream is the higher of the BOD (5) and suspended solids parameters.

35 Ill. Admin. Code § 301.345. The manner in which Illinois law uses this unit of measurement is illustrated by a regulation prohibiting effluent from a "source whose untreated waste load is 10,000 population equivalents or more" from being discharged into the Chicago River System or Calumet River System. *Id*. § 304.120(b).

Illinois law makes clear, then, that the 3.5 PEs assigned to Fiala's single-family home do nothing more, and nothing less, than designate the amount of wastewater the home is presumed to generate. This designation, in turn, is used to estimate the Fiala home's impact on the District's treatment capacity and surrounding environment. Illinois courts refer to PEs in precisely this way and no other. *See*, *e.g.*, *N. Moraine Wastewater Reclamation Dist. v. Ill. Commerce Comm'n*, 912 N.E.2d 204, 217 (Ill. App. 2009); *Vill. of Fox River Grove v. Pollution Control Bd.*, 702 N.E.2d 656, 663 (Ill. App. 1998); *Metro Util. v. Ill. Commerce Comm'n*, 549

N.E.2d 1327, 1328 (Ill. App. 1990); *Greater Peoria Sanitary & Sewage Disposal Dist. v.
Pollution Control Bd.*, 540 N.E.2d 934, 935 (Ill. App. 1989); *Unity Ventures v. Pollution Control
Bd.*, 476 N.E.2d 1368, 1369-1370 (Ill. App. 1985).

The nature of PEs under Illinois law conclusively defeats Plaintiffs' submission that the

3.5 PEs are property that Fiala acquired by virtue of purchasing a home in Fox Mills. Plaintiffs

do not and could not allege that Fiala's wastewater services were in any way limited by the

supposed "theft" of one of his PEs. If Fiala's home produced more than 2.5 PEs (250 gallons) of

wastewater on any given day after the "theft" of one PE, he would not have faced any penalty or

paid any charges for continuing to flush his toilet or run his shower, dishwasher, or washing

machine. Fiala could not sell his PEs to a neighbor, thereby diminishing the amount of water he

was entitled to use and increasing the amount of water his neighbor could use. And there is no

support in law or logic for Plaintiffs' conclusory allegation that the value of Fiala's home was

diminished by the "loss" of one PE, Doc. 42 at 27, for there is no basis to believe that his actual

wastewater services were affected in any way by the "loss."

In short, Fiala's PEs are not property and cannot have been taken or stolen from him.

The supposed theft therefore does not provide a basis for RICO standing.

**B.      Harm to Fiala's "Health and Welfare" Due To The Spraying and
          Discharge of Effluent**

The second amended complaint alleges that Defendants "spray[ed] excess effluent in

violation of Illinois law and [Environmental Protection Agency ("EPA")] regulations for the

purpose of falsifying the capacity of the [District's] system," "spray[ed] effluent when the

ground is over saturated in violation of [Illinois Environmental Protection Agency] regulations,"

and "discharge[d] effluent directly into Mill Creek in violation of both State and Federal EPA

regulations." Doc. 88 at ¶ 38. The complaint alleges that these actions "endanger[ed] the health and welfare of the Plaintiffs and the citizens within the [District] and Illinois." *Id.* at ¶ 39. Plaintiffs' briefs do not elaborate on the complaint's allegations, other than to say that "Defendants have also endangered the health and welfare of Fiala and others similarly situated." Doc. 42 at 27.

Plaintiffs nowhere assert that the spraying and discharge of effluent diminished the value of their homes or property. The alleged environmental harms therefore cannot establish RICO standing. The Seventh Circuit has held "not only that personal injuries do not provide standing in civil RICO actions, but also that pecuniary losses flowing from those personal injuries are insufficient to confer standing under § 1964(c)." *Evans*, 434 F.3d at 926 (citation omitted); *see also id.* at 931 ("personal injuries and the pecuniary losses stemming therefrom do not establish standing under the civil RICO statute"). As the Seventh Circuit explained:

> In the civil RICO context, personal injuries which may result in pecuniary losses, but are nonetheless insufficient to provide standing under § 1964(c) have been found to include injury to mental health or emotional distress; sickness, poisoning and emotional distress; emotional distress due to loss of security and peace; injury stemming from the harassment and intimidation of federal witnesses; loss of income due to wrongful death of a family member/source of support; and inability to pursue or obtain meaningful employment.

*Id.* at 926 (citations omitted). Likewise, RICO plaintiffs may not recover for "physical and emotional injuries due to harmful exposure to toxic waste." *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918-19 (3d Cir. 1991). It follows that Plaintiffs cannot seek redress under RICO for the alleged harm to their "health and welfare."

### C.    Payment of Higher Fees, Property Taxes, and Assessments

As noted above, Plaintiffs allege that because Kobler and other developers paid B&B or

FMLP the connection fees that should have been paid to the District, insufficient investments

were made in the District's infrastructure and capacity, requiring the District to charge Fiala and

other home owners higher fees, assessments, and property taxes to make up the shortfall.

Although Plaintiffs specifically disclaim any reliance on Fiala's taxpayer status, Doc. 88 at ¶ 61

("Plaintiff FIALA is *not* seeking any recovery under [RICO] in his capacity as a taxpayer."), the

second amended complaint references Fiala's payment of higher fees, taxes, and assessments, *id*.

at ¶¶ 1, 18, 46(ww).  In their briefs opposing dismissal, however, Plaintiffs do not argue that the

overpayments constitute an injury for purposes of RICO standing.  Any RICO standing argument

based on the alleged overpayments accordingly has been forfeited.  *See Alioto v. Town of Lisbon*,

651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person

waives an argument by failing to make it before the district court.  We apply that rule where a

party fails to develop arguments related to a discrete issue, and we also apply that rule where a

litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion

to dismiss.") (citations omitted); *Bonte*, 624 F.3d at 466 ("Failure to respond to an argument—as

the [plaintiffs] have done here—results in waiver."); *Wojtas v. Capital Guardian Trust Co.*, 477

F.3d 924, 926 (7th Cir. 2007); *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir.

2001) (a party's failure to oppose an argument permits an inference of acquiescence, and

"acquiescence operates as a waiver"); *Walsh v. Arrow Fin. Servs., LLC*, 2012 WL 255802, at *3

(N.D. Ill. Jan. 27, 2012) (citing cases); *Shaffer v. Nat'l Passenger R.R. Corp.*, 2011 WL

4916493, at *2 (N.D. Ill. Oct. 17, 2011) (citing cases).

Any such argument would have failed in any event due to the "indirect purchaser" rule. The rule holds that a plaintiff cannot seek damages under RICO where it is an indirect purchaser, meaning where it alleges that it paid the costs of a RICO scheme that were passed on by the scheme's direct victim. *See BCS Servs, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 753-57 (7th Cir. 2011). The rule is regularly invoked to defeat the kind of RICO claim at issue in this case. In *Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985), for example, the defendant bribed employees of the Cook County Board of Appeals to obtain lower property assessments for his clients. The bribes indisputably violated RICO, and the plaintiff taxpayers sued the defendant on the theory that Cook County had increased their taxes to make up the shortfall caused by the lower assessments given the defendant's clients. *See id*. at 1174-75. The Seventh Circuit held that the indirect purchaser rule defeated the claim, explaining that RICO does not provide redress for taxpayers who were overcharged due to costs being "passed on" by the scheme's direct victim, which in *Carter* was the County. *Id*. at 1175-76.

Other decisions are in accord. In *Wooten v. Loshbough*, 951 F.2d 768 (7th Cir. 1991), the plaintiff was a judgment creditor of a company driven into bankruptcy by the defendant's RICO violations. While acknowledging that "the defendants' activities made it less likely that [the plaintiff] would collect her judgment[,]" the court held that her claim was barred by the indirect purchaser rule. *Id*. at 769. And in *Illinois ex rel. Ryan v. Brown*, 227 F.3d 1042 (7th Cir. 2000), the plaintiff taxpayers brought suit on behalf of the State of Illinois to recoup interest lost due to the state treasurer's placement of state monies in a non-interest bearing account, a decision that allegedly resulted from a bribery scheme that violated RICO. In holding that the plaintiffs were not the scheme's direct victims and thus could not sue under RICO, the Seventh Circuit cited *Carter*, describing it as a case where

-12-

> the directly injured party was the county, whose tax collections had been less than they should have been because of the acts of bribery and mail fraud at issue; those plaintiffs claimed that they too were injured because their tax assessments were too *high*, as a result of the depressed levels other people's taxes.

*Id*. at 1045. The Seventh Circuit ruled that because "the State of Illinois itself was directly injured by the mis-direction of its funds into non-interest bearing accounts and the pockets of miscreants[,] … the State is the proper party to be suing, not the plaintiffs." *Id*. at 1045-46.

As in *Carter*, *Wooten*, and *Ryan*, the indirect purchaser rule bars Plaintiffs from invoking RICO to recover the amounts by which the District allegedly was compelled to overcharge them due to the siphoning away of money by FMLP and B&B. The direct victim of Defendants' scheme, and thus the only appropriate RICO plaintiff, is the District itself.

Although this result may seem odd at first glance because the second amended complaint names the District as a defendant, the complaint makes clear that the District is *not* a RICO defendant. In its third paragraph, the complaint states: "No money is being sought from the [District] in this action, but instead *they are named herein as an interested party* under Count II with the right to notice that this action may adjudicate *their rights to certain property*." Doc. 88 at ¶ 3 (emphasis added). Count I is the RICO claim, while Count II seeks equitable and declaratory relief under a variety of state law theories. Moreover, the third paragraph's reference to "their rights to certain property" suggests that Plaintiffs (correctly) view the District as the victim, not the perpetrator, of a RICO scheme allegedly concocted by the other defendants. The point is confirmed by the complaint's first paragraph, which alleges that Fiala brought this suit "in his individual capacity as a homeowner in Fox Mill and as a taxpayer for the misappropriation of general public funds for which *the municipality [the District] has a right to collect*, pursuant to *Golden v. City of Flora*[,] … 96 N.E.2d 506, 508 (Ill. 1951)." *Id*. at ¶ 1

-13-

(emphasis added).  Again, the allegation that the District "has a right to collect" funds that the RICO scheme diverted elsewhere suggests that the District is the scheme's victim and not among its perpetrators.  The District's status as a nominal defendant therefore does not undermine the conclusion that it is the direct victim of the alleged RICO scheme and thus the only appropriate RICO plaintiff.

*Carter* recognizes an exception to the "indirect purchaser" rule in RICO cases "'where the direct purchaser is owned or controlled by' the wrongdoer."  777 F.2d at 1178 (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 n.16 (1977)).  The rationale for this exception, which arose from antitrust law, is that where the wrongdoers control the direct purchaser, "the direct purchaser would have little or no incentive to sue on [its] own behalf, thus leaving the indirect purchaser without recourse for any antitrust injuries."  *Doe v. Ariz. Hosp. & Healthcare Ass'n*, 2009 WL 1423378, at *6 (D. Ariz. Mar. 19, 2009).  Those circumstances were present at the inception of this lawsuit in April 2010, when the three trustee defendants controlled the District's three-member board.  But two of the trustees (Brizuela and Sindelar) were replaced in November 2010, giving majority control of the District's board to non-conflicted trustees.  *See* Wasco Sanitary District Trustees, http://wascosd.org/AboutWSD/Trustees/tabid/110/ Default.aspx (last visited Mar. 15, 2012) (identifying Ryan Strauss as President, Thomas Bihun as Vice President, and Skidmore as Trustee); *Bihun, Strauss win in Wasco Sanitary District*, Kane County Chronicle, Nov. 3, 2010 (reporting that Strauss and Bihun defeated Brizuela and William Scanlon in the November 2010 election), *available at* http://fwix.com/news/11230082 (last visited Mar. 15, 2012); Kane County Elections, 2010 General Election Contest Results, http://www.kanecountyelections.org/ElectionResults/2010-11-02/Contests.asp (last visited Mar. 15, 2012) (same); Josh Stockinger, *Wasco candidates disagree on legal fees*, Chicago Daily

-14-

Herald, Oct. 25, 2010, at 4 (reporting that Strauss and Bihun ran as a slate against Brizuela and Scanlon in the November 2010 election).

The non-conflicted trustees have had the authority since November 2010 to seek redress for the alleged siphoning of funds away from it and to FMLP and B&B.  *See* 70 ILCS 2805/3(d) ("[a] majority of the board of trustees shall constitute a quorum").  Because there remains no impediment to suit by the direct purchaser, and because there has been no such impediment since November 2010, the "own or control" exception to the indirect purchaser rule does not apply.  It follows—even putting aside Plaintiffs' forfeiture of the argument that the alleged overpayment of fees, property taxes, and assessments provide a basis for RICO standing—that Plaintiffs are not the proper parties to seek redress under RICO for that alleged injury.

**D.      Payment of "Illegal Fees" by Kobler to B & B**

Finally, the second amended complaint alleges that Kobler was injured when forced to pay "illegal fees" to B&B as a result of the reimbursement agreement between the District and B&B.  There are two conceivable alleged injuries here.  The first is that Kobler "would not have had to pay [the illegal fees] but for the Defendants' wrongful acts."  Doc. 88 at ¶ 62.  Any argument that this injury provides a basis for RICO standing has been forfeited because Plaintiffs' briefs do not press this point in opposing dismissal; in fact, the briefs do not mention this point at all.  *See Alioto*, 651 F.3d at 721; *Bonte*, 624 F.3d at 466; *Wojtas*, 477 F.3d at 926; *Cincinnati Ins. Co.*, 260 F.3d at 747; *Walsh*, 2012 WL 255802, at *3; *Shaffer*, 2011 WL 4916493, at *2.

The second conceivable injury, which is not forfeited, arises from the allegation that "Kobler … w[as] induced to pay monies directly to defendants after being falsely advised by defendants that B&B and/or FMLP owned the rights to sell P.E.'s as some type of commodity."

Doc. 42 at 27. The argument appears to be that the reimbursement arrangement caused harm because the fees first should be paid to the District and then given to B&B, not paid directly to B&B. This alleged injury does not establish RICO standing. Plaintiffs do not contend that the homes Kobler built did not receive wastewater services in exchange for the payments; indeed, the homes did. Nor do Plaintiffs submit that the fees were any higher than they would have been had the fees been paid directly to the District. Accordingly, the fact that money is paid directly to B&B rather than passed through the District does not deprive Kobler of any money (beyond what it would have paid anyway) or services. It follows that the direct payments did not injure Kobler's "business or property" under § 1964(c) and thus that it cannot predicate RICO standing.

## II.    State Law Claims

Having dismissed the RICO claims, which are the only federal claims, the court must decide the proper disposition of the state law claims. If the dismissal of the RICO claims is for lack of subject matter jurisdiction under Rule 12(b)(1), the court must remand the state law claims without considering whether to retain supplemental jurisdiction under 28 U.S.C. § 1367. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Miller v. Herman*, 600 F.3d 726, 730 (7th Cir. 2010). In *Evans v. City of Chicago*, *supra*, the Seventh Circuit definitively held that RICO standing implicates subject matter jurisdiction, not the merits of the RICO claim:

> The phrase "injured in business or property" has been interpreted as a standing requirement—rather than an element of the cause of action—which must be satisfied in order to prevail on a RICO claim. The causation component of § 1964(c)—whether an alleged RICO injury was caused "by reason of" a violation of the statute—has also been considered a component of standing. As such, the issue represents a jurisdictional requirement which remains open to review at all stages of the litigation.

434 F.3d at 924 (citations and some internal quotation marks omitted); *accord, e.g.*, *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008); *Gagan*, 77 F.3d at 958.

On that understanding, the dismissal of the RICO claims is for lack of jurisdiction under Rule 12(b)(1), mandating remand of the state law claims.

It is possible that the Seventh Circuit might revisit the issue and conclude that RICO standing goes to the merits of a RICO claim, thus making Rule 12(b)(6) and not Rule 12(b)(1) the appropriate vehicle for a dismissal grounded on lack of RICO standing. The Seventh Circuit has long considered antitrust standing, a close cousin of RICO standing, to be non-jurisdictional. *See Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994) ("despite the suggestive terminology, 'antitrust standing' is not a jurisdictional requirement and is therefore waivable"). And the Second, Third, and Ninth Circuits have held that RICO standing goes to merits and not the court's jurisdiction. *See, e.g., Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008) ("we review the question of whether the [plaintiff] satisfies civil RICO's standing requirements under the standard for Rule 12(b)(6)"); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 129-30 (2d Cir. 2003) (Sotomayor, J.) (RICO standing "is not jurisdictional in nature under Fed. R. Civ. P. 12(b)(1), but is rather an element of the merits addressed under a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim"); *Maio v. Aetna, Inc.*, 221 F.3d 472, 481 n.7 (3d Cir. 2000) ("While we have designated section 1964(c) as the 'standing' provision of RICO, we point out that our method of analysis in prior cases has been to consider issues of RICO and antitrust standing in the context of reviewing motions to dismiss pursuant to Rule 12(b)(6), despite the fact that the 'injury to business or property' and proximate causation requirements are considered aspects of the plaintiff's 'standing' to sue under section 1964(c) of RICO and section 4 of the Clayton Act.") (citation omitted).

If the Seventh Circuit were to agree with the Second, Third, and Ninth Circuits, then the dismissal of the RICO claims here would be on the merits under Rule 12(b)(6), thus requiring

-17-

the court to decide whether to retain or relinquish supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. (The parties are not diverse, so there is no original jurisdiction under the diversity statute, 28 U.S.C. § 1332.) Under those circumstances, the court would exercise its discretion under § 1367(c) to relinquish jurisdiction over the state law claims and remand them to state court.

Section 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendent state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). This rule has three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Ibid*. None of those exceptions apply here, making remand appropriate. *See Courtney v. Halleran*, 485 F.3d 942, 950-51 (7th Cir. 2007) (affirming the district court's dismissal of the state law claims under § 1367(c)(3) after it dismissed the RICO claims, which were the only federal claims in the case); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 458-59 (7th Cir. 1982) (suggesting that relinquishing jurisdiction over the state law claims would be appropriate because the RICO claims, which were the only federal claims in the case, had been dismissed).

Remand is independently appropriate under § 1367(c)(1), which applies where a state law claim "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). As noted above, Plaintiffs' state law claims ask the court under the Illinois Public Officer Prohibited Activities Act, 50 ILCS 105/3, to declare that the District's trustees violated that statute, to

-18-

nullify any District contract executed while one of the trustees held office, and, under 50 ILCS 105/4, to appoint a receiver until a proper election for successor trustees can be held. Such claims, which strike at the heart of an Illinois municipality's ability to govern itself, are better resolved by the Illinois judiciary. *See Marshall v. Cnty. of Cook*, 2011 WL 5980454, at *4 (N.D. Ill. Nov. 29, 2011) (citing cases).

### Conclusion

For the foregoing reasons, Plaintiffs' RICO claims are dismissed. Jurisdiction is relinquished over the state law claims, which are remanded to the Circuit Court of the Sixteenth Judicial Circuit, Kane County, Illinois. The dismissal of the RICO claims is without prejudice to Plaintiffs pursuing their state law claims in state court.

March 16, 2012

_____

United States District Judge